Argued November 8, 1977, affirmed May 16, 1978

TAYLOR, *Appellant,*
*v.*
OLSEN, *Respondent.*
(TC 95189, SC 24780)
578 P2d 779

Chris P. Ledwidge of Ledwidge & Ledwidge, Portland, argued the cause and filed briefs for appellant.

James C. Tait, Oregon City, argued the cause for respondent. With him on the brief were Hibbard, Caldwell, Canning, Bowerman & Schultz.

Before Holman, Presiding Justice, Tongue and Linde, Justices, and Richardson, Justice pro tempore.

LINDE, J.

**LINDE, J.**

Plaintiff sued for damages for injuries she sustained when her car, on a dark and windy January evening, struck a tree which shortly before had splintered and fallen across a Clackamas County road. The trial court directed verdicts for defendant Clackamas County, the owner of the right-of-way on which the tree was located, and Marion Olsen, the adjoining landowner who was alleged to be in possession of the same location. Plaintiff appeals from the judgment entered on the directed verdict for Olsen.

The parties disagree about the measure of responsibility of one in possession or control of land near a public road for injuries to travelers caused by such trees. Defendant maintains that he had no duty of reasonable care with respect to the tree involved in this case. Plaintiff assigns as error, first, that the trial court directed a verdict for defendant on this issue, and second, that the court excluded testimony by local witnesses which was offered to show that defendant should have recognized the danger that the tree might fall onto the road.

This court has not previously had occasion to consider the question of liability for injuries caused by the fall of roadside trees. However, such injuries have long been common enough to develop lines of cases in other jurisdictions.[1] Generally, a possessor's duty of reasonable care toward the traveling public will arise from his actual knowledge of the dangerous condition of the tree.[2] The more difficult question is whether he

---

[1] Annotations can be found in 19 ALR 1021 (1922), 49 ALR 840 (1927), 72 ALR 615 (1931), 11 ALR2d 626 (1950), and 14 ALR2d 186 (1950). *See also* Prosser, Torts § 57, at 355-356 (4th ed 1971); McLeary, *The Possessor's Responsibilities as to Trees,* 29 Mo L Rev 159, 166-171 (1964); May, *Adjoining and Abutting Landowners: Liability for Injuries to Persons or Property,* 1 Will L J 413, 422-423 (1960).

[2] *See, e.g., Lemon v. Edwards,* 344 SW2d 822 (Ky 1961); *Hay v. Norwalk Lodge No. 730, B.P.O.E.,* 92 Ohio App 14, 109 NE2d 481 (1951); *Plesko v. City of Milwaukee,* 19 Wis 2d 210, 120 NW2d 130 (1963).

will be held liable if he should have known of the danger, and specifically, under what conditions he has a duty to inspect his trees to discover a latent danger.

In assessing conditions under which they have denied such a duty as a matter of law, courts have often been frank to base their conclusion on the impracticality or economic cost of obligatory inspection in relation to the probability of harm from falling trees or limbs. Half a century ago, the Supreme Court of Minnesota rejected such an affirmative duty in these terms:

> Many of our public highways pass through timbered country, and upon the prairies owners have been encouraged to plant trees. It will add a very heavy burden on the servient fee owner if he must exercise the supervision and care for the dominant easement in this respect. If such a duty is laid upon him he becomes liable, in case of a failure, to respond in damages that may sweep away the value of his whole farm by some unfortunate accident like the present. Severe wind storms are not rare in this state, and a jury influenced by sympathy for the injured party are [*sic*] so prone to find the accident the result of negligence upon the slightest pretext.

*Zacharias v. Nesbitt,* 150 Minn 369, 372-373, 185 NW 295 (1921). Similarly, in a case from West Virginia, a federal court of appeals thought that to allow liability upon an allegation that defendant should have known of the dangerous condition of the tree "will impose a new and unusual burden upon the owners of forest lands," unjustified by the danger to the public that might result from the failure to inspect. "This danger, in the case of rural lands upon a country road, is, to say the most, a very remote one; and in view of the burden which the requirement of inspection would impose, it

---

In *Bradfield v. Anderson,* 230 Or 199, 200, 369 P2d 274 (1962), the complaint in a wrongful death action alleged that the decay and dangerousness of the tree that struck decedent's car was "visible and apparent to defendants and had been known by them for a long period of time". The court stated that the question of the landowner's liability in such cases was a new one in Oregon, but it would not be decided on a motion to strike the allegation.

is too remote, we think, to justify a holding that the landowner is charged with such a duty." *Chambers v. Whelen,* 44 F2d 340, 341 (4th Cir 1930).

About the same time, however, the federal court in another circuit let a jury find liability when the latent decay of the falling tree "was known or by the exercise of ordinary care could have been known" by the landowner, where the tree stood in what the court called "a tract of suburban forest" two miles outside a city. *Brandywine Hundred Realty Co. v. Cotillo,* 55 F2d 231, 231 (3d Cir 1931), *cert. denied,* 285 US 555 (1932); Annotation, 11 ALR2d 626, 629 (1950). It was only to be expected that the balance of considerations quoted above would shift with increasing suburban and in-terurban automobile traffic on the one hand and, on the other hand, an increasing readiness to place on owners of land as much as other enterprises the cost of risks associated with their activities. The shift appears between section 363 of the 1934 Restatement of Torts, which qualified the general rule of nonliability to persons outside the land for natural conditions on the land only by a caveat "expressing no opinion" as to roadside trees, and the 1965 Restatement of Torts 2d, which recognizes a duty to "exercise reasonable care" on the possessor in an "urban area" and reduces the caveat of "no opinion" only to "rural" areas.[3]

In a federal tort claim arising in Oregon 20 years ago, the United States District Court had to anticipate what this court would hold when the falling tree was one of many thousands lining the roads through the

---

[3]Comment *e* to Restatement of Torts 2d, § 363(2), states:

The rule stated in Subsection (2) is an exception which has developed as to trees near a public highway. It requires no more than reasonable care on the part of the possessor of the land to prevent an unreasonable risk of harm to those in the highway, arising from the condition of the trees. In an urban area, where traffic is relatively frequent, land is less heavily wooded, and acreage is small, reasonable care for the protection of travelers on the highway may require the possessor to inspect all trees which may be in such dangerous condition as to endanger travelers. It will at least require him to take reasonable steps to prevent harm when he is in fact aware of the dangerous condition of the tree.

Willamette National Forest and the road across which it fell was relatively lightly traveled. Judge Solomon concluded that on those facts, Oregon would not apply the duty of care stated in *Brandywine Hundred Realty Co. v. Cotillo, supra,* but rather Judge Parker's reasoning in *Chambers v. Whelen,* quoted above. *O'Brien v. United States,* 166 F Supp 231 (D Or 1958). The case was tried without a jury, and the Ninth Circuit on appeal found it unclear whether the district court had held as a matter of law that the abutting landowner owed no duty of reasonable care with respect to roadside trees or as a matter of fact that this duty had not been breached. The court of appeals thought that the second view of the trial court's decision was more probable and sustained it as correct on the facts. But even if the decision stated a rule of law, the court of appeals thought that the statement could be affirmed insofar as it was narrowly limited to "the duty of the owner of forest land in a sparsely-settled area adjoining a little-used highway." *O'Brien v. United States,* 275 F2d 696, 698 (9th Cir 1960).

 We think *O'Brien* was right in stating that, except for extreme situations, the question of the landowner's or possessor's attention to the condition of his roadside trees under a general standard of "reasonable care to prevent an unreasonable risk of harm" is to be decided as a question of fact upon the circumstances of the individual case. The extent of his responsibility either to inspect his trees or only to act on actual knowledge of potential danger cannot be defined simply by categorizing his land as "urban" or "rural." Surely it is not a matter of zoning or of city boundaries but of actual conditions. No doubt a factfinder will expect more attentiveness of the owner of an ornamental tree on a busy sidewalk (*see, e.g., Turner v. Ridley,* 144 A2d 269 (DC 1958); *Plesko v. City of Milwaukee,* 19 Wis 2d 210, 120 NW2d 130 (1963)) than of the United States Forest Service in the *O'Brien* situation, but the great variety of intermediate patterns of land use, road use, traffic density, and preservation of natural stands of

trees in urban and suburban settings prevents a simple "urban-rural" classification. *See Hensley v. Montgomery County,* 25 Md App 361, 367-370, 334 A2d 542, 546-547 (1975). Moreover, other factors than the character of the land and of the road are relevant in deciding whether a particular defendant was in a position where he should have given reasonable attention to the potential dangerousness of a roadside tree.

Even in a rural setting, for instance, it can make a difference whether the defendant or others for whom he is responsible are engaged in activities that involve the trees at the location in question or that alter the natural conditions at this location. Decisions like *Chambers v. Whelen* and *O'Brien, supra,* stress the burden and the impracticality of a general duty to inspect standing trees when imposed on owners of large tracts of rural land simply as landowners. As a Maryland court recently summarized its review of the cases, the onus on a homeowner of inspecting a few trees in his yard is modest, but the "practical difficulty of continuously examining each tree in the untold number of acres of forests" or in "sprawling tracts of woodland adjacent to or through which a road has been built [can be] so potentially onerous as to make property ownership an untenable burden. This would be particularly true for an absentee landowner." *Hensley v. Montgomery County, supra,* 25 Md App at 366-367, 334 A2d at 545. It is less obviously true, however, for one who is engaged in logging or in actively developing the land. Thus our neighboring State of Washington, where standing timber plays much the same role as in Oregon, distinguished *O'Brien, surpa,* and permitted a plaintiff injured by a fallen tree on a "remote" road to go to the jury against a bank as owner of forest land because the land was not in its natural condition but had recently been logged. *Albin v. National Bank of Commerce,* 60 Wash 2d 745, 375 P2d 487 (1962). Consequently, we examine the present case with these factors in mind.

In this case, the road in question was a two-lane blacktop highway serving a number of communities in Clackamas County. There was testimony that it was used by an average 790 vehicles a day; in other words, a fallen tree might encounter a vehicle within an average of about two minutes, depending on the time of day. Defendant had purchased the land adjoining the road in 1973 for logging purposes, and during the five or six weeks before the accident he had logged about half the timber on his land. This included the trees adjacent to the tree on the county's right-of-way that eventually fell onto the road. Under these circumstances, we conclude, as did the Washington Court in *Albin, supra,* that it would be a jury question whether defendant had taken reasonable care to inform himself of the condition of this tree, provided there was evidence that an inspection would have disclosed its hazardous condition.[4]

The evidence is that after the tree broke and fell onto the road, the center of the tree at the point of the break proved to be decayed. However, the decay did not extend through the bark, or even to the surface below the bark except perhaps in a few places. Only by chopping or boring into the trunk of the tree would there have been a substantial chance of discovering the decay. Thus the question is not so much whether defendant had some responsibility to give his attention to the safety of this tree left behind by his logging operations as, rather, how far that responsibility extends.

---

[4] In *Albin,* the plaintiff's theory was that the hazard posed by the tree was increased by the logging, which "cut down the protective timber around" the tree that fell, and the trial court instructed the jury that the bank's duty to inspect and potential liability could be predicated only on this alteration of the natural condition. 60 Wash 2d at 752, 375 P2d at 491. In the present case, plaintiff's first allegation of negligence was that "[d]efendant removed the trees which had served as a natural windbreak" for the falling tree, and that thereafter defendant should have realized the resulting risk and taken measures to prevent it or brought it to the attention of the owner, Clackamas County. This allegation was stricken however, on motion of the plaintiff.

[ 350 ]

There was no evidence to suggest that chopping or drilling into the trunk would have been a normal or expected way to examine a standing tree in the absence of external indications that it might not be structurally sound. The only reference to such a procedure came from defendant Olsen himself, when called by plaintiff as an adverse witness. Defendant had testified that the tree, located on county property immediately adjacent to defendant's land, was about 60 years old and approximately 85 feet tall. It was divided above ground into two separate trunks, "clubby" or short, and leaned a few degrees toward the road. Defendant also testified that a double-trunk tree might rot from water seeping into the tree where the trunks joined, but that he did not observe signs of such rot. His testimony continued:

Q Did you ever examine the tree very closely?
A Yes.
Q When?
A Well, I put a road right past it off the highway and you naturally, if you are in the business, you look at trees and you are always aware of something that might be dangerous or so forth.

Q So you would have—as a logger, you would want to know the condition of the trees; is that correct?
A That's correct, yes.

Q All right. How would someone test a tree for rot that is not clearly visible?
A Well, you either have to drill into it or chop into it.

Q Now, by chopping into it you could just chop off the bark, perhaps? Would that be one way of doing it?
A You couldn't see by chopping the bark off.
Q What if the rot were just beneath the bark?
A If it was just beneath the bark, you could see it.

Q Okay. So you could check for rot by drilling it or chopping it or peeling off the bark if the rot were that close to the surface; is that true?

A That's correct if the rot were on the surface, which it wasn't on this tree.

Q Not on the surface, but close to the bark; is that correct?
A On this tree it wasn't close to the surface.
Q You are saying the rot was centered in the tree?
A It was in the center of the tree, yes.
Q And didn't go beyond the center of the tree?
A That's correct.

■ ■ There was no other testimony to suggest that the tree showed exterior signs of possible decay or that chopping or drilling into the trunk would be a common and reasonable practice for inspecting trees generally. Plaintiff called a number of neighborhood witnesses to testify that the tree, left isolated by the logging, swayed violently in strong winds, and he assigns as error the court's exclusion of their opinion testimony that the tree looked as if it might be blown over. In the context, it is clear that this testimony was offered to establish generally that defendant "should have known" of a possible risk requiring him to make an inspection, not to indicate a particular risk of internal decay.[5] We need not pursue this assignment of error, since we have already recognized plaintiff's general proposition that, under the circumstances, the defendant was not free from any duty of reasonable care to consider the safety of this tree. But the record does not show that the excluded testimony would have been of help on the further issue whether a reasonble examination should have gone so far as to chop or drill into the trunk of the tree. The imposition of such a duty in the setting of this case requires more than the general observation that a tree sways in the wind, especially when it would involve cutting into the tree of an adjoining landowner for which this defendant may be responsible, if at all, only by virtue of his activities on the land and his logging of the adjacent trees. It

---

[5]The closest approximation was a statement by a housewife of the neighborhood that "[i]t was an unhealthy tree," which the jury was instructed to disregard. This was followed by a colloquy between court and counsel in chambers and further testimony, which did not suggest that the witness had meant any closer observation of the tree than that of a passer-by on the road.

requires some evidence either that the defendant should have been on notice of possible decay in this tree, or that cutting through the bark to the trunk is a common and ordinary method of examining trees generally. In the absence of such evidence, it was not error to direct a verdict for the defendant.

Affirmed.